FILED

NOV 17 2003

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. 03-0142-N |
| | ) | |
| JOANNA HERNANDEZ | ) | |

# RECOMMENDATION OF THE MAGISTRATE JUDGE

Indicted under  21 U.S.C. § 841(a)(1) for possession with intent to distribute cocaine

hydrochloride, Defendant Joanna Hernandez ("Hernandez") seeks to suppress "all evidence and

statements obtained as a result of [her] unlawful detention and arrest"[1] and the warrantless search

of her vehicle  following a routine traffic stop for speeding.    Based upon the  evidentiary hearing[2]

and a careful consideration of the briefs, arguments, and applicable law, the Magistrate Judge

concludes, as herein explained,  that the detention and search  exceeded Fourth Amendment limits.

Accordingly,  it is the Recommendation of the Magistrate Judge  that the suppression motion be

granted.[3]

---

[1]*Post-Hr'g Br. in Support of Motion to Suppress* at 10 (Doc. 43, October 31, 2003)

[2]A  Texas resident,  Hernandez did not appear at the scheduled hearing on October 16, 2003, and following a failed attempt to make telephone contact directly with her,  the Court found – based on relevant representations from defense counsel– that she knowingly and intelligently waived personal appearance after advice from counsel. *Tr.* at 3 -9.

[3]On August 19, 2003, Hernandez filed  separate motions for dismissal and suppression (Docs.26 and 27), each alleging constitutional violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments.  Because she  offered no evidence in support of Fifth and Sixth Amendment claims (*see Tr.* at 11-14) and specifically declined to "pursue the Fourteenth Amendment  issues cited..." regarding racial profiling and selective prosecution (*see Def.'s Post-Hr'g. Br.* at 9), only the Fourth Amendment claim is properly before the Court.

EOD 11-17-03

46

# I.  FACTS

The essential facts are undisputed and confirmed substantially by a videotape of the traffic

stop.[4]  Pursuant to his assigned duties for "general law enforcement, accident investigation, [and]

traffic enforcement," Alabama State Trooper Jessie Peoples ( "Trooper Peoples") was "working

stationary radar" along interstate 65 on June 30, 2003, when he observed,  about 3:02 a.m.,  "a

silverish, newer-model Chevrolet pick-up truck . . . traveling in the left-hand lane northbound," at

78mph, above the posted speed limit of 70.[5]   Hernandez,  owner of the vehicle, occupied the front-

passenger seat, along with the driver,  Jesus Alejandro Salazar ("Salazar").   Trooper Peoples

initiated a traffic stop at the 165 mile marker near the Hope Hull exit,  northbound on interstate 65,

and the videotape establishes  the following sequence of events.[6]

### (a) *3:02:47 - 3:02:59 a.m.   Trooper's initial encounter at defendant's vehicle*

Walking first to the passenger side of the vehicle, Trooper Peoples "noted  that there were
food containers in the rear floor area [and] it was occupied by a female passenger and the male
driver." The driver complied promptly with the trooper's requests  for his driver's license and for
him to step back with him between the vehicles.[7]

---

[4]Offered by both the defendant (*Def.'s Ex.1*) and the government (*Gov't. Ex..4*) and admitted as a
joint exhibit, the 38-minute videotape was recorded from a body microphone, worn on the trooper's belt,
which transmitted to a video recording device in his car's overhead console. The videotape did not capture
all of the statements and sounds at the scene either because the trooper had turned off his microphone (*Tr.*at
20:1-2;  ) , the equipment fails to function properly if the microphone is an "extended distance" from the
vehicle (*Tr.* at 19), or due to technical malfunctions in the "loaner"video equipment.(*Tr.* at 19-21).

[5] *Tr.* at 16: 12-25, 17: 4-8; 24: 4-7.

[6]The times are those depicted on the videotape; according to Trooper Peoples, the times from
the video camera may differ slightly (not "more than a minute or two")from the patrol clock used
to record times on his warning ticket and reports.    *Tr.* at 27:1-14.   The Court has included its
uncertified  transcription from the discernible audio and has added pertinent  testimony adduced at
the evidentiary hearing to clarify inaudible or difficult to transcribe statements.

[7]*Tr.* at 18: 15-17

(b) *3:03:00 – 3:03:35 a.m.   Trooper's Encounter #1 with driver Salazar*
*[between truck and trooper's vehicle]*

As he examined the Texas-issued license for Salazar[8], Trooper Peoples advised that he "was running 78", and Salazar replied, "I didn't realize that . . . I was trying to get to a rest room for my girlfriend - she's got diarrhea." Informed that he had just passed an exit with a rest room, Salazar expressed surprise, and the Trooper then engaged him as follows:

> Q: Where you headed to?
>
> A: We're going to Atlanta.
>
> Q: How long are you going to be up there?
>
> A: The weekend . . . through the week.
>
> Q: The whole week? .
>
> A: Yes sir.

Salazar exhibited no verbal or physical resistance to the Trooper's request that he come back to his

vehicle and sit inside.

(c) *3:03:49 – 3:05:47 a.m.   Trooper's Encounter#2 with driver Salazar*
*[inside trooper's vehicle]*

The videotape does not show Salazar and Trooper Peoples inside the latter's vehicle, but the audiotape does capture the Trooper's questions clearly and Salazar's responses, albeit not as clearly. At the evidentiary hearing the Trooper disclosed his purpose at the time – that he "was going to write him a warning since he was not argumentative about his speed" [9] – and testified that he retrieved his warning book and was "starting to actually write the warning"[10] during his following conversation, with Salazar inside the trooper's car:

> Q: Is that your truck?
>
> A: No, that's hers.
>
> Q: You live in Houston?
>
> A: Yes.

---

[8]*Id.* at 24: 24-25.

[9]*Id.* at 24: 19-20, 39: 6-7)

[10] *Id.* at 25: 4-9.

3

Q:  First time to Atlanta?

A:  mine is . . .

Q:  Not hers . . . What's her name?

A:  Joanna Hernandez

Q:  How long y'all been together?

A:  [Inaudible response]

Q:  Does she have family there?

A:  [inaudible response]

Q:  Is this like a spur of the moment trip or you guys been planning it for a while?

A:  well, spur of the moment [rest of response not audible]

Q:  What kind of work you do?

A:  [inaudible response]

Q:  What's the weather like back in Houston?

A:  [inaudible response]; According to Trooper Peoples, Salazar responded that "there was a tropical storm with 40 mile-an-hour winds" when he left Houston, *Tr.* at 25: 9-17.]

Q:  What's your reason for speeding?

A:  [inaudible response]

Q:  It's the bathroom issue?

A:  [inaudible response]

Q:  What's her name again?

A:  Joanna Hernandez

Q:  She's got the registration on the truck?

A:  Yes.

Q:  OK, wait just a minute, OK.

Trooper Peoples exited his vehicle and approached Hernandez, still seated in the front of her truck,  for the stated purpose of securing her proof of registration for the truck.

4

(d) *3:05:55 – 3:08:10 a.m.  Trooper's Encounter #1 with Defendant Hernandez*
*[questioned  at passenger door* of her truck]

After asking Hernandez if she owns the truck and requesting  registration papers, Trooper Peoples questioned her for approximately two minutes, and the following reflects the dialogue sufficiently audible for reasonably accurate transcription:

Q:  Is this your truck?

Q:  You got the papers?

Q:  You have your ID?

A:  Yes sir, I have my license.

Q:  What kind of work do you do?

A:  I'm a nurse.

Q:  How long y'all gon be up in Atlanta?

A:  Probably until Wednesday.

Q:  Who's this fella back here?

A:  My boyfriend . . .

Q:  [Trooper directs  Hernandez to remove her license for inspection].  OK, we're going to check  everything.  Y'all going to be in Atlanta until Wednesday?

A:  Probably until Wednesday . . . I'm not sure.

Q:  You're not sure?

A:  Probably until Wednesday . . . it just depends on how bad she is.

[Trooper Peoples testified that Hernandez said they were traveling to Atlanta to visit her sick aunt. *Tr.* at 38].

Q:  What's wrong with her?

A:  They say she had a stroke but they're not in the medical field. . . .{inaudible}....

Q:  They had to take her to the hospital?

A:  Yes, she's in the hospital.

Q:   What area of Atlanta does she live in?

A:  [inaudible] . . . .  I know it starts with a "G."

Q:  Gwinnett?

A:  Yeh, it's Gwinnett.

5

Q:   Where's your luggage at?

A:   Right here . . .

Q:   Just one bag? [examining bags in body of truck]...two bags...two small bags....

alright, I'll be back with you in just a minute, OK?

### (e) 3:08:17 – 3:13:00 a.m.  Trooper's Encounter #3 with Salazar
### [Inside Trooper's Vehicle]
### Trooper contacts United States Customs

Trooper Peoples directed these additional questions to Salazar, commencing at 3:08:27 a.m.

- Y'all just coming up here on vacation?
- What family members does she have up here?
- Nobody's sick...nothing like that...?

Approximately 10 seconds later, the trooper made a radio request for a license check, providing the motorists' full names, license numbers, the vehicle tag and details of the speeding offense to "U.S. Customs. . . . for license validation, if they're wanted, if there's actually warrants for them . . . and actually, they can check border crossings on the vehicle."  [11]   He did not receive an immediate reply but provided his phone number for their response.

During an interim in his conversation with a Customs representative, Trooper Peoples asks Salazar if they had been driving all night. After concluding the phone report to Customs at 3:11:20 a.m., the officer "[had] not completed [but] was close to completing" the warning ticket for Salazar."[12]   Apparently while doing so, he posed these additional questions to Salazar, whose responses are not clear:

- You ever been in trouble?

- You don't have any sick relatives up there, do you?

- Did she just ask you to ride along?

**At 3:11:52 a.m.,   Trooper Peoples told Salazar: "OK, monitor your speed, OK, I'm**

**going to write you a** warning.   Less than a minute later, however, he asked Salazar whether

---

[11] Though the person called by trooper is not identified, the videotape recorded his initial question: *"Hey, can you make a stop for me..." I-65 northbound at the 166?"?* Because his next statements related identifying data for Salazar and Hernandez, it appears that all of his radio communications at this juncture were directed to a Customs representative. See *Tr.* at 27: 19-22.

[12]*Id.* at 28: 7-14.

Hernandez is a licensed practical nurse or a registered nurse and solicited further information about the nature of her work.

> (f) *3:13:22 – 3:14:00 a.m.   Trooper's Encounter #2 with Defendant Hernandez*
> *[still inside truck at passenger side]*

Although the audiotape does not lend itself to accurate transcription for this encounter, Trooper Peoples testified that ["coming up on 3:14 in the morning"], he returned to defendant's vehicle to "[return"] her driver's license and the registration to the truck [and] [w]e just had conversation about her being a nurse. At that point, I noted that her level of nervousness was high. She was making minimal or no eye contact; and she had a closed posture, which was her arms folded and her legs crossed." As he headed back to his vehicle, Trooper Peoples commented on his body microphone, "arms crossed - legs together." [13]

> (g) *3:14:10 – 3:17:45 a.m.   Trooper's Encounter #4 with Salazar*
> *[Inside Trooper's Vehicle; consent to search requested]*

Prior to his fourth encounter with Salazar, Trooper Peoples had not given the warning ticket promised at 3:11:52 a.m. and had not authorized him to leave the scene; nor had Salazar refused to sign the warning ticket. Promptly upon re-entering his vehicle, he began this additional round of questions:

> *Q: Hey, before I let you go, you guys aren't transporting anything illegal, are you – like guns or drugs – like marijuana, cocaine?*
>
> A: inaudible response
>
> Q: You have a problem with me searching the truck to make sure?
>
> A: No, sir.
>
> Q: Y'all not committing any type of terrorist activity, are you?
>
> A: No.

_____

[13]*Id.* at 29.

7

Around 3:15:08 a.m., the videotape recorded Trooper Peoples making radio contact with Trooper Brown, who regularly travels with his narcotics canine,[14] and while awaiting his arrival, Trooper Peoples' continuing questions to Salazar are recorded as follows: "So this is your first trip to Atlanta, huh?" What kind of gas mileage y'all getting on the truck? How long it's been since you've been to Mexico? What part of Mexico? Did you like it? ."

At 3:17:00 a.m. Trooper Peoples presented and explained to Salazar a consent form prepared for his consensual search of the vehicle and asks him to sign if he agreed; according to the Trooper, Salazar "did not object. . . .[h]e took it and signed the form" around 3:17:45 a.m.[15]

(h) *3:18:08 – 3:18:53 a.m.   Trooper's Encounter #3 with Defendant Hernandez [consent to search requested ]*

Trooper Peoples' communications to secure consent from Hernandez were not recorded, but he testified that he explained to her the same consent form executed by Salazar and had her sign as well [16] before escorting her from the vehicle to stand just in front of the trooper's vehicle during the vehicular search.

(I) *3:19:34 – 3:39:00 a.m.    Search of truck*

Assisted by Trooper Brown and his narcotics canine, Trooper Peoples searched the truck, and using a fiber-optic scope, located "vacuum-sealed packages" with suspected narcotics behind a concealed trap door modified in the rear wall of the truck's extended-cab seat."[17]  Hernandez and

---

[14] See *Tr*. at 104:11-22.

[15] *Id.* at 31:18-22.

[16] *Id.* at 32:7-13; *Gov't Ex*.1

[17] *Id.*. at 46-47.

Salazar were informed of the narcotics alert and advised of Miranda rights before being handcuffed and arrested around 3:38:22 a.m.. The truck was towed to an auto shop where officers "removed the rear seat, found some spliced wiring, and found a trapdoor in the center of the wall of the truck, removed the trapdoor, and it contained the bundles" seen initially by Trooper Peoples and subsequently verified to contain 43 pounds of cocaine.

---

Asked by the government prosecutor why he searched defendant's vehicle, Trooper Peoples explained these "several reasons":

> First, Mr. Salazar changed on the length of the trip from the weekend to the week.
> . . When I asked him, I said, how long are you going to be in Atlanta. He said, well,
> the weekend –no, the week. There was minimum luggage in the car for the trip.. . .
> It was just two small bags in the back floorboard.
>
> They were traveling from Houston to Atlanta, which is two main source cities for
> narcotics. Also, there was discrepancies in their stories. He said they were on
> vacation; she said they were going to see a sick aunt. They left at night, traveling
> at night during severe weather, which was the tropical storm, the high winds, pretty
> much traveling nonstop. Another thing was that she was complaining or he said that
> she had diarrhea, and they drove right past a well-lit exit.
>
> And then talking to her, I asked, you know, just what area of Atlanta. And she was
> – she was, like guessing the exit. And then she started guessing a city, which was–
> she was saying Gaines-, Gaines-, it starts with a G. So I just threw up a name,
> Gwinnett. And she said, yeah, Gwinnett, like she said, that's fine. It was like she
> was just agreeing with what I said. [18]

---

[18]*Id* at 36:10-13, 37:14-25, 38:1-18.

## II.   DISCUSSION

### A.   Contentions

Hernandez does not challenge the trooper's stop of her truck for speeding; instead, she contends that "the investigative detention exceeded both its permissible scope and duration," arguing:

> Instead of pursuing the speeding violation, the Trooper began an investigation for other illegal activity by separating the two motorists and then posing the two with a series of questions designed to search for discrepancies.  Next, the Trooper unlawfully prolonged the detention by not issuing a citation and returning the drivers driver's license and instead waited for a warrant check that appears to never have been completed.  Trooper Peoples admitted under oath that he had already made up his mind to use the K-9 even before he asked for consent.  He had also called the K-9 unit to ascertain their location in the middle of the questioning of the driver.  This would indicate that the Trooper was in-fact delaying the stop to give the K-9 unit an opportunity to get to the scene to conduct a search.  This was not a consensual encounter since the driver's license was not returned and the Trooper did not have an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring.

Post-Hr'g. Br. at 4-5

Hernandez relies principally on the Eleventh Circuit's opinions in *United States v. Pruitt*, 174 F.3d 1215 (11th Cir. 1999) and most recently in *United States v. Perkins*, No. 02-15891, 2003 WL 22400700 (11th Cir. Oct. 22, 2003).

The Government relies on the "consent" exception to justify the warrantless search, and citing *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001), contends that neither the duration – "approximately sixteen minutes.... between the stop and the [consent]" – nor the scope of the detention exceeded constitutional limits.   The Government argues that detention extended reasonably and permissibly for a response to the trooper's request for a computer check on criminal histories for Hernandez and Salazar, and it denies that any questioning unrelated to the purpose of the stop unreasonably extended the detention. *Response* at 5-6.

10

**B.** **Analytical Framework**

This routine traffic stop does invoke the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures,[19] and it triggers the limited *Terry v. Ohio*, 392 U.S. 1 (1968) scrutiny generally reserved for police-citizen encounters which are "relatively brief," *see Berkemer v. McCarty*, 468 U.S. 420, 437 (1984), and "legitimate and restrained investigative stops short of arrests." *See Perkins*, 2003 WL 22400700, at *2, citing *Brown v. Illinois*, 422 U.S. 590 (1975) and *Purcell*, 236 F.3d at 1277 ("Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest [citing *Berkemer*, 468 U.S. at 439]. Therefore, we analyze the legality of these stops under the standard articulated in Terry v Ohio. . ..")

Since addressing the constitutionality of detentions following a routine traffic stop in *United States v. Tapia*, 912 F.2d 1367 (11th Cir.1990), the Eleventh Circuit has "consistently held that once an officer has briefly stopped a motor vehicle operator for the purpose of issuing a traffic violation (*i.e.*, a ticket), the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Pruitt*, 174 F.3d at 1219, quoting *United States v. Griffin*, 109 F.3d 706, 708 (11th Cir.1997) (citing *Tapia*, 912 F.2d at 1370); accord *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam) (noting that a police stop cannot otherwise last "any longer than necessary to process the traffic violation").

---

[19]A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away", *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975), and a traffic stop qualifies as such a seizure. *Delaware v. Prouse*, 440 U.S. 648 (1979).

Applying the *Terry* restraints on the duration and scope of post-traffic stop detentions, the *Purcell* court emphasized that "an officer's actions during a traffic stop must be "reasonably related in *scope* to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S.Ct. 1868 (emphasis added), and as underscored in Pruitt and Holloman, the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." *Purcell, id.* at 1277.

## C.    **Analysis**

The Government correctly notes that the Eleventh Circuit has not found constitutionally infirm detentions incident to traffic stops which have exceeded the interval in this case of approximately 16 minutes between the trooper's stop of the vehicle and the occupants' grant of consent to search. [20] These pertinent facts are undisputed: (a)  the trooper promptly secured the driver's license on their first encounter and, about two minutes after the stop,  began writing a warning ticket at 3:04:00 a.m.; (b)  about two minutes later, he secured from Hernandez her license and registration papers; (c)  around 3:08:37 a.m., he requested license validation from customs; (d) at 3:11:52 a.m., he declared to the driver his apparent intent to release him with a warning ticket and admonition to monitor his speed; (e)  the trooper returned to Hernandez around 3:14:10 a.m. her license and vehicle registration documents; (f) less than a minute later,  in lieu of ever submitting the promised warning ticket to the driver for signing, the trooper  solicited from him  a consent to search the truck, summoned assistance from another trooper and his canine, and proceeded to secure consent as well from Hernandez.    Notwithstanding that the trooper never completed his purpose for  the traffic stop – by citing or warning the driver for speeding – the duration alone does not make

---

[20]For example, the Eleventh  Circuit in analyzing "reasonable suspicion" in Terry stops, has found constitutional  detentions which lasted fifty minutes , see *Hardy*, 855 F.2d at 758-61, and even 75 minutes, *see United States v. Gil*, 204 f.3d 1347, 1350-51 (11th Cir. 2000)

this traffic stop constitutionally impermissible under the Eleventh Circuit's guiding precedents.

Nonetheless, this finding does not shield the officer's conduct during the detention from further evaluation because the required Fourth Amendment review must encompass the *totality of circumstances* attendant to the detention in order to assess the officer's reasonable suspicion of criminal activity warranting any detention unrelated to the traffic stop.   As the court emphasized in *Tapia*, 912 F.2d at 1370:

> "Reasonable suspicion" in the context of a *Terry* stop is determined from the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), and from the collective knowledge of the officers involved in the stop. (*citations omitted*). Such a level of suspicion is obviously considerably less than proof of wrongdoing by a preponderance of the evidence (citation omitted), or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. *Sokolow*, 109 S.Ct. at 1585. Nevertheless, "reasonable suspicion" must be more than an inchoate "hunch" and the Fourth Amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop. (*citations omitted*).[21]

For this "reasonable suspicion" analysis, the court now examines the totality of the evidence related to Trooper Peoples' "actions during [this] traffic stop"  [to evaluate whether they were] "reasonably related in *scope* to the circumstances which justified the interference in the first place." Trooper Peoples stopped the Hernandez truck around 3:02 a.m. for speeding and upon finding the driver "not argumentative about his speed,"   he escorted him to the police vehicle with the intent of giving him a warning citation; that intention did not change within the next ten minutes as the videotape records at 3:11:52 a.m. his ostensibly final admonition  to "monitor your speed, OK, I'm

---

[21]The analysis of reasonable suspicion requires the court to give due deference to the factual inferences drawn by law enforcement officers. See *United States v. Arvizu*, 122 S.Ct.744, 750-751(2002) (citing *Ornealas v. United States*, 517 U.S. 690, 699 (1996).

going to write you a warning," a process which generally takes him only four to five minutes.[22]

The record discloses no reason at all for the trooper's delay in completing and issuing the warning ticket prior to 3:11:52 a.m., as he had all the information needed for that purpose; in fact, by that time, Trooper Peoples had completed, signed, and dated the ticket, including all the data requested (driver's name, address, age, driver's license state and number; description and location of offense; description of vehicle and tag number; type and location of the traffic offense) and leaving blank only the line for "remarks."[23]   Trooper Peoples offered no testimony regarding any additional information or investigation necessary to complete the warning ticket.   Assuming that his decision to give a warning or a ticket required an *explanation* from the driver for his speeding, Salazar offered that explanation before being escorted to the police vehicle.   Once inside the vehicle, Trooper Peoples did not ask Salazar any questions which appeared reasonably necessary for any investigation associated with the purpose of the traffic stop – save another request that he explain his speeding.   That inquiry – "What's your reason for speeding?"– followed a barrage of questions unrelated to the speeding violation: their residency in Houston; whether the trip to Atlanta was a first-time trip; how long Salazar and Hernandez had lived together; whether Hernandez had family in Atlanta; whether their trip was a spur-of-the-moment trip; the weather in Houston.[24]

Following this initial conversation with Salazar inside his vehicle, Trooper Peoples left to secure from Hernandez the truck's registration documents; the reasonableness of this action merits no scrutiny as a traffic stop reasonably encompasses an officer's request for, and examination of,

---

[22]*Tr.* 91: 8 -16; 92: 10-12, 22-25; 93:1

[23]*Def.'s Ex.* 3.

[24]*See* chronicled events summarized *supra*, (c) 3:03:49 - 3:05:47 a.m.

14

driver's license and vehicle registration documents.   Like her driver,  Hernandez complied promptly, and neither the videotape nor any testimony suggests either any undue delay in the trooper's examination of the registration documents or any questions directed about them.   Instead of proceeding back to his car with the registration documents and completing the warning ticket, the evidence shows that Trooper Peoples engaged Hernandez with questions for another two minutes or so.  All were unrelated to the speeding violation and, pursuant to the trooper's  admitted search for discrepancies,  some duplicated the inquiries already made to Salazar: the nature of her work; duration and purpose of their trip to Atlanta; her relationship with Salazar; nature and extent of her aunt's sickness and her address in Atlanta; the quantity and locate of their luggage. [25]  Immediately upon returning to Salazar inside the trooper's vehicle, Peoples sought from him corroboration for the responses from Hernandez  without disclosing her  responses, he asked  Salazar:     *Y'all just coming up here on vacation? What family members does she have up here?  Nobody's sick...nothing like that . . . ?*

By 3:08:40 a.m., Trooper Peoples had spent at least six minutes with Hernandez and Salazar –longer than his own estimated time to issue a citation for the speeding violation which prompted their encounter with him.  During the interval between the initial stop at 3:02:00 a.m. and 3:08:40 a.m.,  the trooper had not completed a ticket although he had secured all information necessary for that purpose, but he had relentless pursued several  investigative inquiries unrelated to the purpose of the traffic stop.   Indisputably, Hernandez and Salazar were subject to detention and seizure during this period, and no contrary contention is presented.

Initially, the court rejects any suggestion that the time between 3:02:00 a.m. and 3:08:40 a.m.

---

[25]*See Tr.* at 98-100 and  *supra,* (d) 3:05:55 - 3:08:10

15

represented reasonable delay for a response by Customs to the trooper's call; the videotape clearly

establishes his *subsequent* call at 3:08:42 a.m.[26] Nor should there be any doubt concerning the

significance of the investigative inquiries made prior to 3:08:42 a.m., for the trooper based his

decision to search the truck on his assessment of the behavior of, and responses from, Hernandez

and Salazar during this period.[27]

_____

[26]In its post-hearing brief, the Government argues: "Because the Customs query had not yet been completed, Peoples' questions in the interim did not improperly extend the duration of the stop, which itself was not excessively long. Thus, Peoples' questioning was constitutional." (*Response* at 6-7). The prosecutor's questioning of Peoples concerning the Customs query is reproduced below:

> Q (AUSA): It's about 3:14 and somewhere around 40 seconds on the videotape, right, when you asked for consent, right?
> A:      Yes.
> Q:      Had the driver signed the warning ticket at that time?
> A:      No.
> Q:      Had you received the information back from the BLOC or the customs office when you–where you had called?
> A:      No.
> (THE COURT): Excuse me just a second, Trooper, had Mr. Salazar refused to sign the warning ticket?
> A:      No, ma'am. I just had not –
> (THE COURT): You had not asked him to sign at that point.
>
> Q (AUSA):  And is it your practice to wait for a call back from Customs before you release motorists? That is, were you deliberately trying to wait until you got a call back from Customs?
> A:      To make sure they're not wanted or to make sure his license is valid. She– well, I can't say. The agent or person that I had talked to had not called back to return that information.

*Tr.* at 29:16-25, 30:1-12.


[27]Explaining his intent to search the vehicle, Trooper Peoples testified: *First, Mr. Salazar changed on the length of the trip from the weekend to the week.. . . When I asked him, I said, how long are you going to be in Atlanta. He said, well, the weekend –no, the week. There was minimum luggage in the car for the trip.. . . It was just two small bags in the back floorboard.*

*They were traveling from Houston to Atlanta, which is two main source cities for narcotics. Also, there was discrepancies in their stories. He said they were on vacation; she said they were going to see a sick aunt. They left at night, traveling*

(continued...)

16

In defense of Trooper People's questioning, the Government, citing *United States v. Purcell,* 236 F.3d at 1279, notes that "questioning, even on a subject unrelated to the purpose of the stop, is [not] itself a Fourth Amendment violation.  Mere questioning . . . is neither a search not a seizure." That citation is properly attributable, however, to the Fifth Circuit, in *United States v. Shabazz,* 993 F.2d 431, 436 (5th Cir.1993); after noting the Fifth Circuit's view that "the issue regarding "unrelated" questions concerns not the content of the questions, but their impact on the duration of the stop," and also considering the Tenth Circuit's view on the issue, [28] the *Purcell* court did not strictly embrace either view  for the Eleventh Circuit, but noted instead that the questions there in controversy would be permissible if analyzed under both the Tenth Circuit's and the Fifth Circuit's view.  Thus, an appreciation for the factual context and analysis in*Purcell* is necessary in order to distinguish this case.

A sheriff's deputy in *Purcell* stopped a  vehicle for following too closely another vehicle

---

[27](...continued)

*at night during severe weather, which was the tropical storm, the high winds, pretty much traveling nonstop.  Another thing was that she was complaining or he said that she had diarrhea., and they drove right past a well-lit exit.*

*And then talking to her, I asked, you know, just what area of Atlanta.  And she was – she was, like guessing the exit.  And then she started guessing a city, which was– she was saying Gaines-, Gaines-, it starts with a G.  So I just threw up a name, Gwinnett.  And she said, yeah, Gwinnett, like she said, that's fine.  It was like she was just agreeing with what I said.*

Tr. at 36:10-13, 37:14-25; 38:1-8.

[28]As noted in *Purcell, id.* at 1279, the Tenth Circuit cases "severely limit the kind of questions which are permissible in a routine traffic stop, including a limitation on questions regarding contraband and weapons.  *See United States v. Holt,* 229 F.3d 931,940 (10th Cir. 2000) (question exceeds reasonable scope of traffic stop absent reasonable suspicion of illegal activity or reasonable safety concerns); *United States v. Jones,* 44 F.3d 860 , 872(10th Cir. 1995) (holding that questions regarding transportation of contraband, are justified only if the officer has reasonable suspicion of illegal activity); *United States v. Turner,* 928 F.2d 956, 959 (10th Cir. 1991) (holding that officer must have reasonable and articulable suspicion to question the driver about drugs or weapons).

17

on an interstate.  Upon examining the license and rental agreement tendered to him by the driver, the deputy noted that the agreement was not in the driver's name  and that his name had been deleted as an additional driver. After  securing  identification from the two passengers, the deputy radioed a request for a license/tag computer checks and began writing a traffic citation to the driver while he awaited a response.  The court states the remaining relevant facts as follows:

> *Prior to asking Purcell to sign the citation, Deputy Warren asked him if he had ever been arrested.  Purcell replied that he had and that the arrests were drug related. The deputy then asked Purcell if he had "any narcotics, weapons, firearms, contraband, anything like that in the car."  Purcell replied that he did not.  At this point, approximately fourteen minutes into the traffic stop, Shon Purcell consented to a search of the car, saying, "I've got nothing to hide."  Id. at 1276.*

After unsuccessfully seeking to suppress the cocaine found in the search of the vehicle, the Purcells appealed their guilty plea convictions and contended, in part, that the deputy "exceeded the scope of a permissible traffic stop when he asked them whether they had guns, firearms, or narcotics in the car."  Concluding that under either the Tenth Circuit's or the Fifth Circuit' tests, "[the deputy's] question about guns or drugs was permissible," the court explained:

> He had stopped a vehicle in a very high crime corridor, where armed drug couriers ply their trade daily.  The driver, Shon Purcell, produced a rental car contract signed by a party not in the car.  Although it listed Shon Purcell as an additional driver, his name had been scratched out.  While writing the citation, he asked Shon Purcell if he had a record and Purcell admitted that he did and that it was drug related.  At that point, even if his suspicions did not arise to the level of "articulable" (footnote omitted), reasonable safety concerns justified Deputy Warren in asking Purcell whether he had any firearms, guns, or drugs in the car. (citation omitted). Furthermore, the question regarding weapons was asked while the officer was still writing out the citation and awaiting the results of the computer check. (footnote omitted)  Thus, the unrelated question did nothing to extend the duration of the initial, valid seizure.  The detention continued to be supported by the facts that justified its initiation."

The *Purcell* facts are patently too dissimilar from this evidentiary record to compel the same conclusion.  In the first place, Hernandez — unlike the appellants in *Purcell* and the Tenth Circuit

cases – does not focus her constitutional attack on a single inquiry regarding contraband or weapons in the vehicle – an inquiry ultimately made by Trooper Peoples to her driver over twelve minutes into the detention, and followed immediately by a request for permission to search in order to corroborate his negative response. Her focus is on the interrogative detention before the trooper even requested any license validation and before he inquired about contraband or weapons; that detention – while not an "excessively long duration"–kept Hernandez seized and detained for a purpose wholly unrelated to the purpose of the traffic stop, and the analytical focus is whether reasonable suspicion of criminal activity warranted such detention.   Contrary to the cases which reflect the Fifth Circuit tests and contrary to *Purcell*, the questioning at issue does not occur while the officer is waiting for a computer check on the driver's background, and neither evidence of concern for the trooper's safety[29] nor any articulable suspicion of criminal activity even necessitated any computer check with customs.[30]

Indeed, Trooper Peoples' testimony casts considerable doubt on whether he delayed the completion and delivery of the promised speeding citation in order to get a response from Customs or to follow his hunch of criminal activity by getting a narcotics canine at the scene for a search

---

[29]The *Purcell* court acknowledged the "well established [rule] that officers conducting a traffic stop may 'take such steps as [are] reasonably necessary to protect their personal safety' (citations omitted) and that "[m]any courts have recognized that knowledge of the criminal histories of a vehicle's occupants will often be relevant to that safety." *Id.* at 1277  The record is void for any threat to the trooper's safety, and any threat is belied by the fact that the trooper allowed Hernandez to remain – unrestrained – inside her car while he questioned an equally unrestrained Salazar alone inside his vehicle.

[30]The trooper's decision to call "U.S. Customs" rather than the Department of Public Safety (DPS) is not explained by reference to any specific, articulable facts pointing to criminal culpability for Salazar or Hernandez.  Questioned by defense counsel about the choice, Peoples acknowledged using both DPS and Customs for "background checks" and explained his choice of the latter by reference to the Texas tag on the Hernandez vehicle (*Q: And how do you decide when to use Customs?  A: Just – Texas is a border state to the –to Mexico.  And I use it for – to see if there's any nexus to the border.  Tr.* at 52:3-6)

he already intended to make.  After making the call to Customs at 3:08:42 a.m. and completing it around 3:11:20 a.m., Trooper Peoples awaited a response on his cell phone, but left it inside his car while he continued his communications with Salazar inside, and Hernandez outside, and he began searching the truck less than ten minutes later.  Though he testified that Customs can report "*within four or five minutes; sometimes it's 15 minutes.  And they'll usually tell you that, hey – we're having trouble getting responses from this state or this state,*" he did not secure any estimated response time, made no request or follow-up call, and never did get the background check requested. [31]

The trooper acknowledged that he formed his intent to search the vehicle during the six minutes of his investigative detention between 3:02 a.m. and 3:08 a.m. and even before he requested a Customs check.  The following colloquy with defense counsel is pertinent:

Q:  Now, in the video when you call – you already mentioned you called Customs.  But the second part – the second person you called when you asked for their 20, that was Mr. Brown, Chris Brown.

A:  Correct.

Q:  And he was in the area.

A:  Correct.

Q:  His response in the video you can't really hear.  But what was his response?  How far away was he from you?

A:  Two miles.  He said he was at the 168.  We were between the 165 and 166 mile marker.

---

[31] *Tr.* at 53 -54).  Asked if he ever got the requested background check, Trooper Peoples responded:  "After– after noting the– I don't recall if it was, you know, during the stop – I'm not–sorry – you know, after we had located the contraband.  But after obtaining a consent and finding the aftermarket modifications on the truck and after finding the contraband, that just – I just totally disregarded that." *Tr.* at 90: 22-25, 91:1-2.

20

Q:  Now, regarding Mr. Chris Brown, as far as you know, how long has he been with a canine?

A:  Probably seven or eight years.  That's a guess.

***

Q:  And you've worked with him on different cases?

A:  Yes.

**Q:  You were probably going to call Chris Brown – you were going to call him either way, whether there was consent to search or not; is that correct?**

**A:  Yes.**

**Q:     So you already had in your mind to call Chris Brown to search that vehicle; is that correct?**

**A:    After – after talking to the individuals, yes.**

Q:    That was way before you asked for consent.

A:   I believe it was right before I asked for consent.

*Tr.* at 56-57 (emphasis added).

In response to the court's pointed inquiry, Trooper Peoples explained his decision further:

*The Court*:  All right. I want to make sure that we get a complete record. So let's do this, Mr. Ramirez. You asked him at what point in time he decided to call Trooper Brown to conduct the canine search. Let him give his complete answer first and then examine him about it. He had begun a litany of reasons relating to when he decided to call Trooper Brown.
[To Trooper Peoples:   Would you continue and complete your answer?]
[To Mr. Ramirez:   Then you may examine him].

*A: (Trooper)*: After talking to the driver and the passenger and noticing that the vehicle – the contents – the food containers in the vehicle, the minimum or no luggage, the discrepancies in their story of the nature of the trip. They were traveling from a known source city, which is Houston, to Atlanta, which is another source city. They left in tropical storm conditions. She appeared to be unsure of the destination she was traveling to. She started with the Gaines-, Gaines-, it starts with a G; and I threw out Gwinnett, so she immediately said, yeah, it's Gwinnett. And the length of

21

the trip.  First it was we're staying for the weekend; no, we're staying for the week.
So there's discrepancies there.  At that point, I thought there was a secondary crime
being committed, and I was going to ask for consent to search.

Q: (Mr. Ramirez): And I think you mentioned even if he said no to the consent, you

were still going to use the canine; is that correct?

A: I would have asked Chris to deploy his canine on that truck.  Yes.

———

Given the trooper's admission that he determined to search the vehicle – with or without

consent from Hernandez – after talking with them during a six-minute interval immediately after

stopping their speeding vehicle, the analysis properly shifts to whether he acquired at that time any

reasonable suspicion of their involvement in criminal activity.   After considering all of the reasons

he highlighted,  within the evaluative framework provided by Eleventh Circuit precedent, this court

concludes that they fall woefully sort of the requisite "specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant the intrusion."[32] *See Tapia*,

912 F.2d at 1370.   It appears at most that the trooper's conduct reflected nothing more than an

inchoate "hunch", perhaps borne of experience or predisposition,  that these particular motorists

were engaged in crime.[33]

As underscored during the relevant cross-examination on this issue, the discrepancies and

_____

[32]The videotape shows the time as 3:14:00 a.m. when the trooper returned to Hernandez her driver's
license and registration.  Though he is not heard advising her that she was then free to leave, it is clear that
she was detained involuntarily until at least that time, and arguably longer, as the trooper had not yet released
the driver.

[33]Although Hernandez sought to establish a practice by  this trooper of making routine traffic stops
of Hispanic motorists and extracting their consent for vehicular searches, the claim was not developed and,
in fact, was abandoned for this suppression motion.  Thus, this court should not be construed as expressing
any judgment in that connection.

responses deemed suspicious by Trooper Peoples – considered individually and collectively – were subject to reasonable explanations inconsistent with reasonable suspicion of criminal activity.[34] For example, while "inconsistent statements about destination" can "contribute to the formation of an objectively reasonable suspicion of illegal activity," *Pruitt* at 1220, both Hernanez and Salazar confirmed Atlanta as their destination and though they offered different plans upon arrival, even the Trooper admitted that each reason could be true.[35]   The trooper's suspicion that their luggage raised doubts about the stated purpose of their trip is undermined by his admitted ignorance of the quantity of clothing contained in the "two small bags."[36]

Trooper Peoples pointed not only to his perception of inconsistent or untruthful responses but also his perception of nervousness by both Hernandez and Salazar. Adding this component to the "totality of the circumstances" still fails, however, to provide the reasonable suspicion requisite for this detention. Concerning his observations of Hernandez, the officer conceded that her "closed posture" could just as well reflect her earlier expressed need to use a bathroom.[37]

---

[34]Though clearly not intended as an exhaustive list, the following factors were highlighted in *Purcell, Id.* at 1220, among the "variety of factors [which] may contribute to the formation of an objectively reasonable suspicion of illegal activity: . .. having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination (*citations omitted*) . . . . driving with a suspended license (*citations omitted*) and reluctance to stop (*citations omitted*).   None of these factors is evidenced on this record.

[35]*Tr.* at 83-84.

[36]*Id.* at 81-82.   Similarly, Trooper Peoples had no basis for denying the non-criminal explanations suggested for the fact that Hernandez and Salazar had been traveling all night and had food containers in the truck. *Id.* at 86-87.

[37]*Tr.* at 84:24-25, 85:1-11. The trooper also conceded that the nervous behavior he attributed to the driver could have reflected the general anxiety experienced by stopped motorists, especially when they are escorted to sit inside a police vehicle (Tr. at 86:2-13); moreover, notwithstanding his testimony that the driver exhibited a "high anxiety level" indicative of "somebody that's committing a secondary crime or that's wanted" (*Tr.* at 110:13-15), he   admitted that further investigation cleared Salazar of any criminal
(continued...)

Weighing collectively all of the reasons offered by Trooper Peoples, as the "totality of the circumstances" analysis requires, they fail to buttress a "reasonable suspicion of criminal activity" precisely because no evidence is offered to connect them for such an inference. No evidence provides any credible basis for the trooper's inference that these night-time, licensed travelers in a registered vehicle evinced any pattern, practice, or demeanor unique to narcotics or other criminal activity. Neither attempted to flee, possessed weapons or made threatening statements or moves; the videotape depicts neither clothed in a manner which should reasonably alert a trained officer to criminal activity. Trooper Peoples – on traffic patrol duties – offered no testimony that he had any reason to stop these motorists independent of his radar-confirmation for speeding less than 10 miles over the posted limit. No evidence suggests any readily discernible details about the truck or its occupants sufficient to convert a routine traffic stop into an investigation for drugs and other contraband for which the totality of circumstances indicated no reasonable suspicion. Indeed, only one of the various reasons proffered by the officer directly implicates – and reflects the officer's knowledge of – drug trafficking patterns: the fact that Houston, the point of departure for Hernandez and Salazar, and Atlanta, their destination, have each been determined by law enforcement analyses to be a "source city" for drug trafficking. Because there is no evidentiary basis to accord this single fact either inordinate or dispositive weight in considering the totality of the pertinent reasons and circumstances, this Court concludes that insufficient reasonable suspicion of criminal activity justified the detention of Hernandez following this traffic stop and the effective completion of its purpose. Accordingly, the consents secured during the unlawful detention were tainted by the

---

[37](...continued)
involvement with the drugs seized. (*Id.* at 112).

24

officer's Fourth Amendment violation, and under these circumstances, the consent by Hernandez cannot be deemed voluntary.

This conclusion is buttressed by the Eleventh Circuit's most recent analysis of this question in *Perkins,* another case from this District involving a detention and vehicular search following a traffic stop. In *Perkins,* an Alabama Highway patrol officer initiated a traffic stop after observing erratic driving. After explaining to passenger and driver the purpose of his stop, he secured the driver's license and insurance papers and "asked [him] to get out of the car so he could give [him] a warning ticket for a lane violation, assuring him that, after the issuance of the warning citation, he would be free to leave." *Perkins,* 2003 WL 22400700, at *3. Like Hernandez in this case, the passenger remained in the car while Perkins sat in the patrol car for the officer's completion of a warning ticket, during the course of which the following occurred, as summarized by the appellate court:

> *Noticing the Tampa address on Perkins' Florida driver's license, Colston asked Perkins if Tampa was his ultimate destination. Perkins' negative response prompted Colston to ask him a series of questions about his residency, employment, and destination. Perkins explained that he had once lived in Tampa but had since relocated to Montgomery, Alabama, where he was employed at Rhodes Furniture. In response to Colston's questions about his destination, Perkins indicated that he was headed to Greenville, Alabama. According to Colston, Perkins was extremely nervous, breathed rapidly and repeated Colston's questions before answering them. Perkins was not free to leave during this questioning.*

*Id.*

The officer radioed the dispatch officer to conduct a driver's license check, and while awaiting the response, he questioned Perkins extensively, inquiring about his passenger's residency, his own residency in Montgomery, his intent to secure an Alabama license, and the person he intended to visit in Greenville. Upon receiving a response indicating a valid license and no outstanding criminal warrants for Perkins, the officer gave him the completed warning ticket.

25

Though acknowledging that he had then completed "that portion of his investigation relating to the traffic stop," the officer "continued to detain Perkins because of his nervousness; what he perceived as Perkins' evasive behavior in response to his questions; and his hunch that Perkins was being untruthful about his destination." *Id.*

Similar to Trooper Peoples with Hernandez, the officer in Perkins approached the passenger, apparently to corroborate the responses by Perkins, and also asked him "if the car contained any contraband or other illegal substances." Like Hernandez, the passenger "was not free to leave during this questioning." After completing his questioning of the passenger, the patrol officer returned to Perkins, "retrieved the signed warning citation . . . . and asked whether the vehicle contained any contraband or other illegal substances." A negative response triggered his request for consent to search, and when Perkins refused, the officer "called the dispatch officer and requested a drug-sniffing dog," detaining both driver and passenger for the subsequent search and further interrogation leading to the seizure of drugs from the center console.

The *Perkins* court first rejected the argument that the duration of the traffic stop itself– approximately fifteen minutes for the entire stop – was unconstitutional under Terry[38]. Nonetheless, the court "conclude[d] that the circumstances here do not give rise to the requisite reasonable suspicion justifying continued detention of Perkins and Scott after the warning ticket had been issued." *Id.* Similar to the government's position in this case, in Perkins the government argued that "the totality of the following circumstances gave rise to a reasonable suspicion of drug trafficking: (1) Perkins' nervousness; (2) the "odd behavior" of Perkins in repeating the questions Colston asked him; (3) Perkins' possession of a Florida driver's license while claiming to live in

---

[38]See *Rec.* of Magis. Judge (Oct.3, 2002, at 10); *Perkins*, 2003 Wl 22400700 *4.

Montgomery, Alabama; and (4) the "inconsistent" statements from Perkins and Scott with regard to whom they were going to see in Greenville, Alabama." The Court found that "these circumstances, separately or cumulatively, cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion required under the Fourth Amendment." *Id.*, *5.

Of particular relevance on this analysis is the Court's evaluation in *Perkins* of the officer's perception of the driver's nervous behavior and the differing responses of driver and passenger regarding their intended purposes for their trip to Greenville:

> First, the Supreme Court has noted that a traffic stop is an "unsettling show of authority" that may "create substantial anxiety. "*Delaware* , 440 U.S. at 657. There is no reason [the officer] should have reasonably suspected that Perkins' nervousness was tied to anything other than the fact that he was being momentarily detained by an authority figure with police power over him. On cross-examination, [the officer] admitted that a nervous driver is not itself suspicious....finally the answers given by Perkins and Scott as to whom they were going to see in Greenville, Alabama, do not support reasonable suspicion....Scott's answer did not contradict Perkins' answer in any way. Perkins and Scott could have intended to see both persons during their visit, or Perkins could have intended to visit Shantay while Scott visited Quinn....In this Court we have required more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state-license for giving rise to reasonable suspicion. *See, United States v. Pruitt*, 174 F.3d 1215, 1221 (11th Cir. 1999).(**Holding that the fact that the driver was Hispanic and had an out-of-state license plate was not enough to detain him beyond the issuance of the speeding ticket**); *United Stated v. Tapia*, 912 F.2d 1367, 1371 (11 [th] Cir. 1990)("**Being Mexican, having a few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama)...fail to suggest that the appellant ...[was] engaged in criminal activity other than speeding on the highway.**")
> (emphasis added).

## III.   CONCLUSION

Based upon the foregoing findings and conclusions, it is the Recommendation of the Magistrate Judge that the motion to suppress (Doc.27, filed August 19, 2003) be GRANTED, that the motion to dismiss (Doc.26, filed August 19, 2003) be GRANTED to the extent that it asserts the same Fourth Amendment claim presented in the suppression motion, and that the dismissal motion be DENIED without prejudice to the extent of its additional Fifth, Sixth, and Fourteenth Amendment claims.

Done this 17th day of November,   2003.

DELORES R. BOYD
UNITED   STATES   MAGISTRATE   JUDGE

28

CASE NO. CR-03-142-N

# O R D E R

The clerk of the court is ORDERED to file the Recommendation of the Magistrate Judge and to serve by mail a copy thereof on the parties to this action. The parties are DIRECTED to file any objections to the said Recommendation within a period of 13 days from the date of mailing to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive, or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (11th Cir. Unit B. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 17th day of November, 2003.

DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE